UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
NANCY RAMOS, for Gladys Ramos,      :    05 Civ. 4932 (RMB) (JCF)
                                    :
             Plaintiff,             :        REPORT AND
                                    :      RECOMMENDATION
                                    :
      - against -                   :
                                    :
COMMISSIONER OF SOCIAL SECURITY,    :
                                    :
             Defendant.             :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE RICHARD M. BERMAN, U.S.D.J.:

        Nancy Ramos brings this action on behalf of her daughter,
Gladys Ramos, pursuant to Section 205(g) of the Social Security Act
(the "Act"), 42 U.S.C. § 405(g).   She seeks review of a
determination by the Commissioner of the Social Security
Administration (the "Commissioner"), finding that her daughter is
not disabled and therefore not entitled to Supplemental Security
Income ("SSI") benefits.   The Commissioner has moved for judgment
on the pleadings pursuant to Rule 12(c) of the Federal Rules of
Civil Procedure.   For the reasons set forth below, I recommend that
the Commissioner's decision be vacated and the case remanded for
further administrative proceedings consistent with this report.

Background

        A.   Personal and Medical History

        Gladys Ramos was born on December 24, 1988 and lives with her
mother in an three-bedroom apartment in Manhattan.   (Tr. at 37, 62,

1

269).[1]  Gladys was born with a macrocephalic, or excessively large, head and has had a history of asthma since infancy. (Tr. at 114, 166).

On May 1, 1993, Gladys was seen in the emergency room of New York Downtown Hospital for fever and a cough. (Tr. at 114). She was diagnosed with an upper respiratory infection and was given a prescription for Proventil[2] upon being discharged.

On December 1, 1993, Gladys' kindergarten teacher, Todd Beasley, filled out an Office of Disability Determinations questionnaire. Mr. Beasley found that Gladys "exhibit[ed] poor frustration tolerance behaviors such as fighting, tantrums, crying episodes." (Tr. at 158-59). He described such episodes as occurring "often." (Tr. at 158). Mr. Beasley also stated that Gladys exhibited inappropriate social interaction behavior such as withdrawal, disruptive classroom behavior, peer relationship problems, and teacher-student discipline problems. (Tr. at 158). Mr. Beasley further noted that Gladys demonstrated problems in performing age appropriate self-care and in effectively completing her tasks and that she was having problems writing her name. (Tr.

---

[1] "Tr." refers to the Administrative Record filed with the Commissioner's answer.

[2] Proventil is a bronchodilator used in treating asthma and other conditions with reversible airway obstruction. MedicineNet.com available at http://www.medicinenet.com/albuterol/article.htm.

2

at 159).

On December 13, 1993, Gladys saw Dr. Alain DeLaChappelle, a consulting psychiatrist.  Dr. DeLaChappelle reported that Gladys displayed "near mutism" and below age appropriate behavior.  (Tr. at 162).  He attributed her immature conduct to her difficulty with speaking.  Due to her "unwillingness or inability to speak, no testing of her cognition was possible".  (Tr. at 161).  Dr. DeLaChappelle diagnosed Gladys with Developmental Expressive Language Disorder and noted that her prognosis was "fair." (Tr. at 162).

On the same day, Gladys also saw Dr. Edward Hoffman, a consulting psychologist, who interviewed her and performed a Stanford Binet Intelligence Test.  (Tr. at 163-64).  Gladys displayed low average ability in matching two- and three-dimensional patterns and in quantitative reasoning.  (Tr. at 164).  She showed "mentally deficient functioning in short-term visual memory." (Tr. at 164).  Gladys scored an 82, which placed her "within the low average range of intelligence for her age." (Tr. at 164).  He nevertheless noted that "Gladys shows a higher-intellectual capability" and that her prognosis was very good.  (Tr. at 164).  He recommended that she continue to receive speech therapy.  (Tr. at 164).

On December 21, 1993, Gladys saw Dr. T. Virey, a consulting pediatrician.  Dr. Virey found that she was physically poorly

developed and that her speech was "not clear," although it was "understandable." (Tr. at 166). He found that her lungs and heart tones were clear but reported that Gladys' physical activity was restricted due to her asthma. (Tr. at 165-66). Dr. Virey's impressions were that Gladys suffered from asthma, a speech problem, and a macrocephalic head, and he recommended that she continue her asthma management. (Tr. at 166). He found her ability to perform age appropriate activities to be moderately affected. (Tr. at 166).

On January 19, 1994, Gladys was seen by Dr. A. Dinoff. (Tr. at 167-68). On an Office of Disability Determinations form, he listed her medically determinable impairments as a learning disability, asthma, and a speech disorder. Dr. Dinoff then went on to determine the "level of severity of functional impairment in the developmental domains and behaviors."[3] (Tr. at 167). He relied on the December 1, 1993 report of Mr. Beasley, Gladys' kindergarten teacher, and the December 1993 reports of Dr. DeLaChapelle, Dr. Hoffman, and Dr. Virey to make this determination. (Tr. at 168). Based on those reports, Dr. Dinoff found that Gladys was "moderately impaired in five of the six domains." (Tr. at 168). Unfortunately, the explanation section of the report is illegible,

---

[3]   The domains listed on the form are (1) cognitive development/function; (2) communicative development/function; (3) motor development/function; (4) social development/function; (5) personal/behavioral development/function; and (6) concentration, persistence, and pace. (Tr. at 167-68).

and so the reasoning behind this determination is unknown.

Gladys visited the emergency room of New York Downtown Hospital in 1997 and 1998 for various complaints including fevers, headaches, and a broken finger.  (Tr. at 242-53).  In a February 14, 1997 visit, the examining physician reported that Gladys has a "structural skull deformity" and was complaining of chronic headaches.  (Tr. at 252).  In that same visit it was noted that Gladys had not suffered from an asthma attack in over a year.  The examining physician recommended that Gladys see a neurologist. (Tr. at 252).

On September 23, 1997, Dr. Peter Schindler, an ear, nose, and throat specialist, performed a consultative examination.  Dr. Schindler noted that Gladys participated in special education classes at school, and that while she was intelligible, her speech was nasal and she tended to stutter.  (Tr. at 171).  He also noted that she had a poor vocabulary and that she did not comprehend many words thought her hearing was normal.  (Tr. at 171).  Dr. Schindler diagnosed a "language comprehension deficit."  (Tr. at 171-72).

Gladys' fourth grade teacher, Mr. Layton, completed a progress report on March 18, 1998.  He found that she had not yet shown any progress in Social Studies and Math, and that she sometimes showed an interest in reading, sometimes expressed herself clearly in writing, and sometimes demonstrated task commitment and perseverance.  (Tr. at 173-74).  Mr. Layton further noted that

Gladys often read with understanding, was at ease describing feelings and ideas, and worked well in groups. (Tr. at 173-74). He also observed that she always maintained a clean, neat appearance and observed rules of good hygiene. (Tr. at 174). In his comments, he noted that although she was demonstrating "slow and steady progress in her academic skills," Gladys required a "large amount of attention and teacher intervention to keep her focused on her work." (Tr. at 175).

B.   <u>Procedural History</u>

Ms. Ramos filed an application for SSI benefits on behalf of Gladys on October 8, 1993. (Tr. at 16). Gladys was initially awarded SSI disability benefits due to a learning disability, asthma, and a speech impairment. (Tr. at 16). Congress subsequently enacted the Personal Responsibility and Work Opportunity Reconciliation Act (the "1996 Act"), which amended the standards for determining child disability. Pub. L. No. 104-193, 110 Stat. 2105 (codified as amended in scattered sections of 42 U.S.C.). As a result of the 1996 Act, the Commissioner was required to redetermine the eligibility of individuals under the age of eighteen who qualified for SSI based on disability as of August 22, 1996. Accordingly, the Social Security Administration (the "SSA") published Interim Final Rules (the "Interim Rules") on February 11, 1997. On May 23, 1997, the Commissioner determined that Gladys was no longer disabled under the new definition of

disability for children.  (Tr. at 16).

Ms. Ramos requested reconsideration, and on April 27, 1998, the claim was denied.  (Tr. at 67).  She then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on July 27, 1999.  (Tr. at 76, 265-77).  On February 23, 2000, the ALJ issued a decision, finding that Gladys was not disabled.  (Tr. at 15-19).  The ALJ found that while the "medical evidence establishes that the claimant has [a] severe learning disability, speech disorder and asthma . . . she does not have an impairment or combination of impairments listed in, medically equal to, or functionally equal to one listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. at 19).  Therefore, the ALJ found that Gladys was no longer eligible for SSI.  The ALJ made this determination in accordance with the Interim Rules.  The decision of the ALJ became final when the Appeals Council denied the plaintiff's request for review on April 12, 2005.  (Tr. at 7-9). The plaintiff filed this action on April 28, 2005.

Discussion

    A.  Standard of Review

Judicial review of an SSI disability determination involves two levels of inquiry.  First, the court reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard.  Second, the court must decide whether the decision was supported by substantial evidence.  See 42 U.S.C. §

405(g) (providing that "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (citing Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999); Lugo v. Chater, 932 F. Supp. 497, 500 (S.D.N.Y. 1996).

    B.  Determining Childhood Disability

To qualify for childhood disability benefits, the child must "[have] a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  In order to determine whether a claimant is disabled, the ALJ follows a three-step process outlined in regulations promulgated under the Act.  First, the ALJ determines if the claimant is currently engaged in substantial gainful activity.  20 C.F.R. § 416.924(b).  If she is not, the ALJ must decide if the claimant has a severe impairment, which is more than a "slight abnormality or a combination of slight abnormalities" and must cause more than "minimal functional limitations."  20 C.F.R. § 416.924(c).  If the claimant has a severe impairment, the ALJ must then determine whether it "meet[s], medically equal[s], or functionally equal[s]" in severity an impairment listed in  20 C.F.R. Part 404, Subpt. P, App. 1 (the

"Listing of Impairments" or "Listing"). 20 C.F.R. § 416.924(d).

Under the Interim Rules, "functional equivalence" was to be assessed by looking at the child's functional limitations, i.e., what the child could not do as a result of her impairment. The ALJ was to consider whether the child's functional limitations involved: "(1) an extreme limitation of one specific function such as walking or talking; (2) marked or severe limitations in broad areas of development such as cognition/communication, social functioning, or motor functioning; (3) episodic chronic illnesses or attacks; or (4) marked or severe effects from medications." Kittles ex rel. Lawton v. Barnhart, 45 F. Supp. 2d 479, 488 (E.D.N.Y. 2003) (citing 20 C.F.R § 416.926a) (internal quotation marks omitted). When considering the child's functioning in various "broad areas of development" under the second inquiry, the ALJ was required to find that the child's impairment was functionally equivalent to a listed impairment if the child was extremely limited in one area or markedly limited in two areas. 20 C.F.R. § 416.926a(b)(2)(1997).

On September 11, 2000, the SSA promulgated Final Rules. Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed. Reg. 54747 (Sept. 11, 2000) (codified at 20 C.F.R. pts. 404, 416). The Final Rules differ significantly from the Interim Rules. See Kittles, 245 F. Supp. 2d at 488. Most importantly, the Final Rules use different domains in evaluating

9

"functional equivalence," the category under which the ALJ measured Gladys' disability.  In assessing "functional equivalence," with respect to children of Gladys' age, the Interim Rules considered five broad areas of functioning, including: (1) cognitive/communicative functioning, (2) motor functioning, (3) social functioning, (4) personal functioning, and (5) concentration, persistence, or pace.  20 C.F.R. § 416.926a(c)(5)(iv) (1997).  The Final Rules consider six domains, involving the child's ability to: (1) acquire and use information, (2) attend and complete tasks, (3) interact and  relate with others, (4) move about and manipulate objects, and (5) care for herself, as well as (6) the child's health and physical well being. 20 C.F.R. § 416.926a(b) (2001).

The ALJ measured the functional equivalance of Gladys' impairment under the Interim Rules and found that Gladys had "severe impairments" but did not have "an extreme limitation in a specific function, episodic impairments, or side effects due to medication or treatment."  (Tr. at 18).  The ALJ determined that Gladys' "cognitive/communicative functions were less than markedly limited due to her poor performance in mathematics and her language comprehension deficit."  (Tr. at 18).  The ALJ characterized both Gladys' motor functions and social functioning as less than markedly limited and found no limitations in the areas of concentration, persistence, pace, or personal functioning.  (Tr. at

18).  As a result of these findings, the ALJ determined that Gladys' impairments did not impose marked or severe limitations on her functioning.

It is possible that Gladys might have prevailed under the Final Rules.  In order for the Commissioner to find functional equivalence under the Final Rules, a child must exhibit a "marked limitation" in two domains or an "extreme limitation" in one domain.  20 C.F.R. § 416.926a(a) (2001).  An impairment is a "marked limitation" if it "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i) (2001).  The changes in the Final Rules are significant because Gladys demonstrated limitations that fall within the domains of "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and "health and physical well being."  (Tr. at 114, 158-59, 161-62, 164, 166, 171-75, 252).

Gladys has displayed limitations in mathematics and social studies and has been diagnosed with language disorders.  These limitations fall under the "acquire and use information" domain.  20 C.F.R. § 416.926a(g) (2001).  There is also evidence that Gladys has difficulty following instructions, as well as remaining focused on and completing her tasks, and is easily distracted.  These are signs of a limitation under the "attend and complete tasks" domain.  20 C.F.R. § 416.926a(h) (2001).  Gladys has a speech disorder and

has displayed inappropriate social behavior such as withdrawal. These limitations fall under the "interact and relate with others" domain. 20 C.F.R. § 416.926a(i) (2001). Lastly, Gladys' asthma and macrocephalia constitute limitations under the "health and physical well being" domain. 20 C.F.R. § 416.926a(l) (2001). This evidence suggests that Gladys may have a "marked limitation" in at least two of the six domains, resulting in her being disabled under the Final Rules.

    C.   <u>Legal Standard Applied by the Appeals Council</u>

As noted above, the ALJ evaluated Gladys' claim under the Interim Rules. The Final Rules became effective on January 2, 2001, after the ALJ's decision was issued and while Ms. Ramos' request for review by the Appeals Council was pending. Determining Disability for a Child Under Age 18, 65 Fed. Reg. 54747, 54747. Thus, they were in effect when the Commissioner issued the final decision. The SSA's "Explanation of the Effective Date" of the Final Rules states that it is expected that a court would review a final decision of the Commissioner "in accordance with the rules in effect at the time of the final decision." <u>Id.</u> at 54751. Furthermore, the Final Rules apply "to the entire period at issue for claims that are pending at any stage of our administrative review process." <u>Id.</u> Finally "where . . . the Final Rules went into effect while the claimant's application was pending before the Appeals Council, the Final Rules, rather than the Interim Rules

applied by the ALJ, govern the review of the ALJ's decision." Pollard v. Halter, 377 F.3d 183, 191 (2d Cir. 2004); see also Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004); Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003).

In this case, the Appeals Council declined to review the ALJ's decision, stating simply that it "applied the laws, regulations, and rulings in effect as of the date [it] took this action." (Tr. at 7). However, the Appeals Council gave no indication that it understood that the Final Rules were applicable, nor did it hold that the outcome of Gladys' claim would have been the same under either the Interim or the Final Rules.

In a similar Seventh Circuit case, although the Appeals Council denied request for review, it acknowledged the enactment of the Final Rules. In that case, the Appeals Council's letter denying review stated, "[i]n reaching this conclusion, the Appeals Council has . . . considered the final regulations . . . implementing the childhood disability provisions . . . . The new regulations do not provide a basis to change the Administrative Law Judge's decision." Keys, 347 F.3d at 992. By contrast, in this case there is no evidence that the Appeals Council applied the Final Rules to Gladys' claim. Indeed, had it done so, the Appeals Council would presumably have mentioned that although the Final Rules were applicable, the outcome did not change as a result of their application. From the boilerplate language in its denial

13

letter, it seems the Appeals Council simply adopted the ALJ's determination, which in turn had relied on the Interim Rules.

In sum, the Appeals Council appears to have committed legal error by failing to apply the Final Rules. This Court is not in a position to determine in the first instance whether Gladys is disabled under the 1996 Act. Rather, a remand is required in order for the Commissioner to apply the Final Rules or, if this has already been done, to articulate why there is no difference in the outcome under those rules.

Conclusion

For the reasons set forth above, I recommend that the Commissioner's motion for judgment on the pleadings be denied and that the case be remanded for further proceedings in accordance with the Final Rules. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, Room 650, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          December 7, 2006

Copies mailed this date to:

Nancy Ramos
388 Pearl Street, # 14F
New York, New York   10038

John E. Gura, Jr. Esq.
Assistant United States Attorney
86 Chambers Street
New York, New York   10007